IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 95-40544

---

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

VICTOR ISAIAS LIMON-CASAS,

Defendant-Appellee.

---

Appeal from the United States District Court
for the Southern District of Texas

---

September 24, 1996

Before HIGGINBOTHAM, DUHÉ, and BENAVIDES, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

The district court dismissed an indictment charging Victor Limon-Casas with conspiracy to possess cocaine with intent to distribute it and possession of cocaine with intent to distribute it. Despite four appearances before the local magistrate judge, Limon was denied bail and remained in jail in Neuces County, Texas. Acting on information from a confidential informant that Limon was plotting the slaying of the government's key witness, the government obtained a warrant to search Limon's cell. The district court conducted a hearing on the day following the search. It then granted a defense motion to dismiss the indictment for perceived government misconduct in the handling of the search of Limon's cell

and ordered defendant's release. He is now a fugitive. The validity of the warrant is unchallenged. The search of the cell produced photographs of the home and car of the target of the suspected plot.

Defendant's counsel on appeal is unable to identify any denial of Limon's rights, any wrongdoing by the government in conducting the search, or any prejudice that Limon might have suffered in the pending drug case had this search, whose validity was unchallenged below, been illegal. Whatever the limited powers of a federal trial judge to dismiss a lawful federal indictment for government misconduct in preparing the case for trial, there was no basis for this dismissal, and we reverse with instruction to reinstate the indictment.

I

On February 15, 1995, three government agents watched Limon remove approximately one kilo of cocaine from his 1993 Ford Econoline van and deliver it to Guadalupe Ochoa, Sr., a member of Limon's drug organization, recently turned informant.[1] Within a few days the agents followed Limon and a Gilbert "Hamburger" Hernandez to a suspected stash house. On February 22, agents recovered two and one half kilos of cocaine from this house. The

---

[1] We describe the facts as asserted in the indictment and as developed at the detention hearings and the hearing on the motion to dismiss. Limon, of course, has not been tried. The relevant facts at the hearings proved to be undisputed.

wrappings and markings matched those on the cocaine Limon delivered to Ochoa on February 15.

Ochoa had been arrested in Virginia for delivering two kilos of cocaine and twenty pounds of marijuana. He told drug agents that this delivery was made at Limon's direction. Two days after Ochoa's arrest in Virginia, Limon was arrested for speeding in the Ford Econoline van. He had ten thousand dollars in cash with him.

It is important, as we will explain, that Limon appeared before magistrate judge Eduardo E. De Ases at his presentment on February 23, at three detention hearings between February 27 and March 2, and at his preliminary hearing on March 2. At each Limon was represented by Robert A. Berg, his counsel throughout these proceedings.[2] At the detention hearing on March 2, 1995, Officer Bussey, who worked with the DEA and headed drug enforcement for the Corpus Christi Police Department, outlined the government's evidence of drug trafficking. He also described threats that Ochoa and Ochoa's son believed Limon had made on their lives. Ochoa reported to Bussey that during the weekend of February 25 and 26 Limon had telephoned "Hamburger" Hernandez and told him that, "if he [defendant] gets out he's going to do away with Mr. Ochoa," and Hernandez passed this along to Ochoa. Bussey learned from Ochoa's son that, according to Hernandez, Limon said that he would also kill Ochoa, Jr., if he found that he was cooperating with the government. Officer Bussey testified at the detention hearing that

---

[2] The district court appointed Mr. Berg to represent Limon on this appeal when he advised that he no longer represented Limon, who was by that time presumably a fugitive.

Limon furnished a false identification card to his common law wife, who lacked legal status in the country.

James van Kirk was a friend of Limon. A registered professional engineer whose business had recently collapsed in bankruptcy, van Kirk arranged for Berg to represent Limon. In late March Berg ask van Kirk to take photographs of certain property of Ochoa, including his house, business, and Porsche automobile. Van Kirk made two sets of photographs and furnished one set to Berg, the lawyer. At the hearing on the motion to dismiss, van Kirk testified that Limon asked for a set of pictures of the house and car and that he furnished them to him in late March or early April.

On May 22, 1995, a confidential informant, also in the Nueces County jail, told Officer Bussey that Limon "has recently hired an individual to burn the properties and murder a government cooperating witness." Ochoa was the witness. The informant told Bussey that Gilbert Lopez, another drug trafficker, had been paid $2,500 to burn the property or kill Ochoa. Officer Bussey checked the records and found that Lopez had a prior 1986 conviction for aggravated assault. The informant was able to describe Ochoa's residence, business, and car as shown in pictures he said were in Limon's possession. Bussey also learned from Ochoa's neighbors that an individual had been taking pictures of the house and car. Late on the afternoon of May 23, 1996, Limon was moved to another cell, and his vacated cell was taped shut. Apparently through some failure in communication, Limon's new cell was also taped shut. There is a suggestion that the taping of the second cell was to

4

prevent communication between Limon and guards feared to be on his payroll, but there is no evidence that this was the reason or that the officials in charge of the search had intended the taping of the second cell. In any event, this was not the basis the dismissal of the indictment and is not relevant to the issues before us today.

Limon's defense counsel, Berg, learned of the transpiring events and telephoned an Assistant United States Attorney at his home at midnight of the same day. Berg demanded an explanation but was given none. The next morning he filed the motion prompting the hearing and ultimate dismissal now before us. The motion mentioned for the first time a concern that privileged communications between Berg and Limon might be seized and requested a post-seizure examination of any written materials by the court in camera. The motion also asserted that the events were "calculated to retaliate against the defendant's attorney" for events in an unrelated case. The motion did not ask that the search be stayed or that counsel be present when it was conducted. The motion was "served" on the United States Attorneys by slipping a copy under the door early in the morning. Officer Bussey proceeded to obtain the warrant that morning, unaware of the filed motion. The assistant assigned to try the drug case did not obtain a copy until the afternoon because he was in detention hearings before the magistrate judge. Bussey conferred with AUSA Dowd about the warrant and intended search. The application for the warrant specifically requested a search for "photographs of 1726 Rhew, 1818 Baldwin, and 3333 Houston, all in

5

Corpus Christi, Texas." Dowd, heeding routine procedures, instructed Bussey not to examine attorney-client materials and to isolate any materials with an attorney's letterhead. He also instructed Bussey that in executing the warrant he should not use any persons involved in the drug case. The warrant issued at 3:48 that afternoon and authorized search of Limon's cell.

Agents David Gonzalez and Ross Larrimore conducted the search. Gonzalez had been involved in surveillance in the case and been present when Bussey debriefed an informant, contrary to USA Dowd's instructions that the agents executing the search warrant were to have had no prior involvement in the case. Bussey instructed Gonzalez and Larrimore "that [they] were to search for such things as photographs, exclusively photographs that show a residence of some sort, vehicles, in particular a Porsche--a black Porsche vehicle...and some phone numbers, names of people that may be involved in [this] investigation." The search took approximately 45 minutes. The agents seized only the photographs, van Kirk's business card, and a letter handwritten in Spanish to a "Lupe," the informal name of Ochoa. It later developed that the name referred to Maria Guadalupe Medrano, Limon's common-law wife. No correspondence with counsel was seized, and there is no evidence that any communication between attorney and client was disclosed by the search and seizures.

The court conducted a hearing on Limon's motion to dismiss and for ex parte review of attorney-client material the next morning, on May 25, 1995. It is important that before the hearing the government had gained only a copy of the photographs and van Kirk's business card. None of this information was new to the government, and none gave it any advantage in the drug case. The government believed that the photographs were relevant to a possible conspiracy to intimidate or harm a government witness.

The district court was concerned from the start of the hearing about an interception of privileged communications between Berg and Limon or possible "work product." The district judge asked Berg, "how do you know they went through [defendant's] personal correspondence, other than what [defendant] says?" Without requesting any ex parte examination, Berg, avoiding the question of privilege, turned to the photographs and offered his explanation of his intended use of the photographs at trial. He explained that he intended to display to the jury the different lifestyles of Limon and Ochoa by the photographs of Ochoa's property. This explanation, while not answering the court's question, offered an innocent use of the photographs. As we will explain, Limon now can point to nothing that the government learned by the search of Limon's cell that might be described as defensive strategy or work product or that might be prejudicial to Limon's defense of the drug charge. The photographs disclosed no strategy. Their intended use was volunteered in a transparent effort to blunt the inference that

7

Limon was engaged in a conspiracy to intimidate a witness investigation.

The district court found that it "could only assume from these facts that a complete examination of the Defendant's correspondence with his attorney....were calculated to and did, compromise the Defendant's Sixth Amendment right to a fair trial and his Fifth Amendment right to be free from self-incrimination." Among other difficulties with this assumption, there was no evidence of any such materials, and at the hearing Berg declined to offer any such evidence. This telling unwillingness to offer any sworn evidence in open court or in chambers in an ex parte proceeding left the record barren of any supporting evidence. At oral argument before this panel, Berg conceded that he knew of no written communications between himself and Limon that were in the cell. He admitted that he had delivered no documents to Limon but speculated that Limon might have had notes Limon had taken in the course of various visits with counsel in the jail. When the district court asked Berg directly about legal materials, it got no answer.

III

The government has filed an extensive brief detailing the limited circumstances under which a federal trial judge can exercise the extraordinary power to dismiss a federal indictment. We need not canvass that law. We need only remind that at the least the conduct of the government must be outrageous and prejudicial to the ability of a defendant to receive a fair trial.

8

Outrageous government conduct at the least must violate some legal norm and must injure. We are at a loss to understand the basis of the district court's action. The seizure of the photographs was supported by a warrant obtained from a federal magistrate judge and was assumed to be valid by the district court. Indeed, it is by no means clear that a warrant was required to search the cell of this prisoner. The district court expressed concern in the hearing about the need to proceed with haste and demanded to know why the warrant was executed when defendant was represented by counsel. Yet even Limon's counsel did not request that he be present, probably because there is no such right. The court's underlying concern, as best we can tell from reading the record, was the gaining of access to privileged information. We have found no evidence that this occurred. Nor can we find a basis for the court's written finding that the search and seizure was "calculated to and did, compromise the Defendant's Sixth Amendment right to a fair trial...."

The district court also stated in its written order that "[o]ne of the more unconscionable aspects of this case is the U.S. Attorney's refusal to make all information available to the Magistrate-Judge." At the hearing the district court expressed concern that the Magistrate-Judge was not told that Limon was a pre-trial detainee. The relevance of this information aside, Limon had been before the issuing Magistrate-Judge represented by Berg on four occasions, three of them detention hearings that ultimately resulted in denial of bail. The judge thus deprived of this

9

information was the same judge whose order kept Limon in jail.  In sum, we have found no basis for concluding that the government engaged in any conduct that was illegal and prejudicial to the rights of Limon, the defendant.  The findings of the district court are vacated, and the order dismissing the indictment is reversed.  The case is remanded to the district court.

REVERSED and REMANDED.